<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**
JAMES J. WALDRON, CLERK
April 24, 2007
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: <u>/s/Diana Reaves,</u> Deputy

IN RE:                    :    CHAPTER 11
                          :
LYNX ASSOCIATES, L.P.,    :
                          :    CASE NO.:    04-48749 (NLW)
          Debtor.         :
                          :
LYNX ASSOCIATES, L.P.,    :
                          :
          Plaintiff(s),   :
                          :    ADV. NO.:    05-2531
v.                        :
                          :
RM 14 FK CORP.,           :    **OPINION**
                          :
          Defendant       :

**Before:**     **HON. NOVALYN L. WINFIELD**

<u>**A P P E A R A N C E S :**</u>

Dennis J. Drebsky, Esq.
Nixon Peabody, LLP
437 Madison Avenue
New York, NY 10022-7001
Counsel for Debtors

Dale E. Barney, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Co-Counsel for Defendant

Robert Cinque, Esq.
Cinque & Cinque, P.C.
845 Third Avenue
New York, NY 10022
Co-Counsel for Defendant

This matter is before the Court on the motion for Summary Judgment brought by the defendant, RM 14 FK Corp., and the cross-motion for Summary Judgment brought by the plaintiff/debtor Lynx Associates, L.P. As set forth in greater detail below, the Court grants the defendant's motion for summary judgment and denies the cross-motion for summary judgment by the plaintiff/debtor.

## JURISDICTION

The Court has jurisdiction to review and determine this matter pursuant to 28 U.S.C. §§ 1334 and 157(a), and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A)(M) & (O). The following constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure § 7052.

## STATEMENT OF FACTS

A.   **The Chapter 11 Filing**

On June 10, 2004, Lynx Associates, L.P. ("Lynx Associates" or "Debtor") filed its Chapter 11 case in the United States Bankruptcy Court for the District of Nevada. By order dated September 9, 2004, the Nevada Bankruptcy Court thereafter transferred the case to the United States Bankruptcy Court for the District of New Jersey. As set forth in greater detail below, Lynx Associates owns estates for years in 13 commercial properties located in nine states. The Debtor also has a fee interest in all building and improvements on those commercial properties. Lynx Associates continues to manage its affairs as the debtor-in-possession, and has filed, but has not yet

confirmed, its Plan of Reorganization.

During the course of its Chapter 11 case, Lynx Associates commenced an adversary proceeding against RM 14 FK Corp., seeking declaratory relief with regard to a certain stipulation entered into between it and Malease 14 FK Corp. The relevant factual history is set forth in greater detail below.

B.     **History of the Present Dispute**

In 1983, Kmart Corporation ("Kmart") and Lynx Properties Corporation ("LPC") entered into a sale/lease-back arrangement with regard to certain properties owned by Kmart. Specifically, Kmart sold fourteen commercial properties (the "Properties") to LPC. In turn, LPC leased the Properties back to Kmart under separate "triple net" lease agreements (the "Operating Leases"). *Complaint, ¶ 8.*

To fund its acquisition of the Properties, LPC borrowed most of the purchase price for the Properties from Kmart (the loan for each Property, a "Mortgage Loan," and collectively, the "Mortgage Loans"). Each Mortgage Loan is evidenced by a promissory note dated November 15, 1983 (individually a "Note" and collectively the "Notes"). *Complaint, ¶ 9.*

Each of the Notes is separately secured by: (i) a fee mortgage or deed of trust on the Property, and (ii) an assignment of the Operating Lease for each Property (the "Security Documents"). The Notes were issued in an original aggregate principal amount of $35,300,000 with an interest rate of 13.5% per annum. Kmart sold participation interests in these Mortgage Loans to investors who received certificates to evidence their participation interests. National Bank of Detroit

("NBD") acted as trustee for the certificate holders under a trust indenture, and the Notes and Security Documents were assigned to NBD. *Complaint, ¶ 11.*

In 1984, LPC conveyed its interests in the properties to various entities as follows:

(A) LPC leased its interests in the Properties under a single lease to Malease 14 FK Corp. ("Malease" or "Master Leesee") and transferred all of its interests in the Operating Leases (as landlord thereunder) to Malease.[1]

(B) LPC conveyed to Lynx Associates (i) an estate for years in each of the Properties, which estate expires on January 2, 2011, (individually, an "Estate for Years," and collectively, the "Estates for Years") and (ii) a fee interest in all buildings and improvements on the Properties.

(C) LPC conveyed to RM 14 FK Corp. (the "Remainderman") each property, subject to the Operating Leases, the interests of Malease, the Estates for Years held by Lynx Associates, and the Security Documents. Concurrently with this transaction, the Remainderman granted Lynx Associates an option (exercisable following expiration of the Estates for Years in 2011) to lease each Property for "an initial term of three (3) years, and for fifteen (15) consecutive renewal terms, aggregating seventy-seven (77) years."[2]

(D) On June 16, 1984, Lynx Associates, Malease and the Remainderman executed fourteen three party agreements (the "Three Party Agreements") - one for each Property.

*Complaint, ¶ 12.*

By 1999, Lynx Associates had assumed the obligations of LPC. During 1999, Lynx Associates obtained a modification of the payment terms for all of the Mortgage Loans held by

---

[1] Malease 14 FK Corp. was subsequently converted into Malease 14 FK, LLC. The Debtor was not originally, but now is, the owner of Malease 14 FK, LLC (both of Malease entities are referred to as "Malease").

[2] Lawrence Kadish ("Kadish") is the principle of RM 14 FK Corp. (the "Remainderman"), and was the principle of Malease 14 FK Corp.

4

NBD. In connection with this transaction, 1) Cortland Deposit Corporation ("CDC") purchased the Notes and Security Documents from NBD; 2) Lynx Associates and CDC executed fourteen note payment modification agreements, which modified the payment terms of the Mortgage Loans ("Modification Agreements"); and 3) the Notes, Security Documents and Operating Leases were assigned to Bank One Trust Company, N.A. ("Bank One") as Trustee for the new certificate holders, Teachers Insurance Annuity Association of America, Monumental Life Insurance Company and Southern Farm Bureau Life Insurance Company. At the same time, Lynx Associates also obtained an additional loan from CDC in the original principal amount of $4,850,000 ("Additional Loan"). CDC subsequently endorsed the Additional Loan to Bank One, in its capacity as Trustee. *Complaint, ¶ 13*.

On January 22, 2002, Kmart filed a Chapter 11 case in the United States Bankruptcy Court for the Northern District of Illinois. *Complaint, ¶ 16*; *Remainderman's Statement of Undisputed Facts, ¶ 5*. Thereafter, on May 22, 2002, the Remainderman filed a proof of claim in the Kmart case in the aggregate amount of $72,848,058.00. *Kadish Aff., Ex. A*.

On January 1, 2002, Malease failed to make a $287,481.00 semi-annual payment to Lynx Associates. *Complaint, ¶ 15*. Thereafter, on January 24, 2002, Malease filed its Chapter 11 case in the United States Bankruptcy Court for the Eastern District of New York. *Remainderman's Statement of Undisputed Facts, ¶ 5*.

On June 27, 2002, Malease and Lynx Associates entered into a Stipulation and Order Resolving Issues Relating to Master Lease and Dismissing Bankruptcy Case ("Malease Stipulation"), which was executed by the Hon. Dorothy Eisenberg on July 1, 2002, *Kadish Aff., Ex. B*. A number of the terms of the Malease Stipulation are pertinent to the present dispute and are

5

therefore described in detail in the paragraphs that follow.

On the Effective Date of the Malease Stipulation, Malease transferred all of its capital stock to an assignee designated by Lynx Associates[3], *Kadish Aff., Ex. B, ¶ 3*. The Malease Stipulation further recites that Malease's only assets consisted of the Master Lease, the Kmart Operating Leases, and its interest in the Kmart Claims, and also provides that:

> [Lynx Associates] and the Assignee may abandon any one or more of the Properties on 10 days prior written notice to Kadish, subject to and upon the terms and conditions hereafter provided. Prior to the expiration of such 10-day period, Kadish shall have the right (by written notice to [Lynx Associates]) to require [Lynx Associates] to convey its entire interest in such Property, including its estate for years, to an entity designated by Kadish (the "Designee"), subject to the provisions of [Lynx Associates'] non-recourse mortgage and the rights, if any, of any occupant under any operating lease, or other matters of record on the Property, and upon such conveyance, and to the extent such action may be effectuated by the parties herein, [Lynx Associates] shall have no further obligations or liabilities thereunder or in connection therewith.

*Kadish Aff., Ex. B, ¶ 3*.

The Malease Stipulation requires Lynx Associates to pursue satisfaction of the Kmart claims. Further, settlement or compromise of the Kmart claims requires the prior written consent of Kadish. *Id.*, ¶ 4.

The Malease Stipulation also provides that:

> All rental income and other like sums received from occupants of the Properties on or after the Effective Date, shall be distributed in the order for the priority of payments specified in the existing Transaction Documents and mortgage/security documents (i.e. to first pay down the principal and interest on the mortgage debt on a Property by Property basis, as the same shall become due), and subject to the Transaction Documents and the mortgage/security

---

[3] As a result, Lynx Associates became the owner of the Master Leasee.

>documents for a Property, provided no event of default by [Lynx Associates] shall exist for that Property, any excess may be retained by [Lynx Associates].

*Id.*, ¶ 5.

Finally, the Malease Stipulation provides that:

>All recoveries for the Kmart Claims, less legal fees actually incurred by [Lynx Associates] in connection therewith, including with respect to any Property which has been abandoned by [Lynx Associates], shall be distributed in accordance with the order for the priority of payments specified in the existing Transaction Documents and mortgage/security documents (i.e. used first, to pay down the principal and interest on the mortgage debt on each such Property), provided however, if any surplus proceeds exist after the mortgage debt relating to a specific Property is satisfied, then to pay the mortgage debt on the other Properties on a ratable basis.

*Id.*, ¶ 6.

Several months after the Malease Stipulation was signed and the Malease bankruptcy was dismissed, Lynx Associates sold its interests in the North Bergen Property for a gross sales price of approximately $7.8 million.[4] *Complaint, ¶ 23*. The Mortgage Loan on the North Bergen Property was satisfied from the sale proceeds. *Id*.

Approximately two years later, Lynx Associates sought this Court's approval of a stipulation it concluded with Kmart, and J.P. Morgan Trust Company, N.A. ("J.P. Morgan")[5], for the settlement of the lease rejection claims ("Kmart Claims") arising from the Kmart bankruptcy. On May 9, 2005, this Court approved the settlement and Kmart distributed its securities to Lynx Associates on account of the Kmart Claims. The Kmart securities were sold, and Lynx Associates estimates that

---

[4]The North Bergen Property is one of the fourteen properties subject to the 1983 sale/leaseback transaction.

[5]J.P. Morgan is the successor to Bank One, as the trustee for the certificate holders.

the funds allocable to the lease for the North Bergen Property are approximately $1.4 million. ("Kmart Funds"). *Complaint, ¶ 24*.

The Remainderman complains that Lynx Associate's "compromise of the Kmart Claims was in direct contravention of the Malease Stipulation, because [Lynx Associates] failed to secure the 'prior written consent of the Remainderman' in connection with the settlement and compromise of the Kmart Claims." *Remainderman's Statement of Undisputed Facts, ¶ 14*. In fact, it does appear that the settlement and the filing of the motion were all done without first obtaining the Remainderman's consent. However, it appears to be an objection with little substance. The Remainderman was served with the motion, had adequate notice of the hearing date, and made only a limited objection in which it sought to have any settlement proceeds allocable to the North Bergen Property segregated and held pending further adjudication. Lynx Associates agreed to this term and the Court's order so provided. Thus, the Remainderman had an adequate opportunity to assess the settlement, and be heard regarding the merits. This must be viewed as substantial compliance with the requirement for prior written consent.

This dispute between the Remainderman and Lynx Associates pertains specifically to the Kmart Funds allocable to the North Bergen Property and involves the construction of the Malease Stipulation. The Remainderman contends that the plain language of paragraph 6 of the Malease Stipulation requires that the Kmart Funds be used to satisfy the Mortgage Loans on the other Properties on a ratable basis. Lynx Associates rejects the Remainderman's analysis of the Malease Stipulation. It contends, *inter alia*, that paragraph 6 only applies if the North Bergen Property is abandoned and there is a balance due on the Mortgage Loan for the North Bergen property. Additionally, Lynx Associates argues that the controlling provision is found at paragraph 5 of the

Malease Stipulation. It argues that Kmart was a former occupant of the North Bergen Property, and that the settlement proceeds constitute "other like sums" as that term is used in paragraph 5 of the Malease Stipulation. Further, Lynx Associates argues that because the Mortgage Loan on the North Bergen Property was not in default when the Kmart Funds were received, under the terms of paragraph 5, it is entitled to retain the Kmart Funds as excess funds.

## **DISCUSSION**

Federal Rule of Bankruptcy Procedure 7056 incorporates Federal Rule of Civil Procedure 56, which provides that summary judgment may be granted when:

> [t]he pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law.

Fed. R. Civ. P. 56(c).

The initial burden is on the moving party to demonstrate that there is an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Thereafter, the burden shifts to the nonmoving party to identify specific facts that demonstrate the existence of a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e). Further, the court must view the facts and inferences drawn therefrom in the light most favorable to the non-moving party. Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Of course, in deciding a summary judgment motion, the court's role is not to resolve disputed issues of fact or to make credibility determinations. Big Apple BMW, Inc. v. BMW of N.A., Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "In practical terms, if the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of

events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent." Id. at 1363.

I.      **Construction of the Malease Stipulation**

The determination as to which paragraph controls the disposition of the Kmart Funds is a matter of construing the terms of the Malease Stipulation. Both parties concur that the Malease Stipulation is a contract governed by New York law. Given the agreement of the parties and the absence of any significant fact that dictates a different result, the Court looks to the law of the State of New York in order to resolve the matter at hand. Although they urge different constructions of the terms of the Malease Stipulation, both the Remainderman and Lynx Associates maintain that the Malease Stipulation is not ambiguous. However, Lynx Associates hedges its argument by reminding the Court that if it finds an ambiguity it must deny summary judgment and permit the parties to submit extrinsic evidence. See, Lerer v. City of New York, 756 N.Y.S. 2d 217, 219 (A.D. 2d Dept. 2003).

The courts of the State of New York adhere to the proposition that "... when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y. 2d 157, 162 (1990); In re Condor Systems, Inc., 290 B.R. 752, 755 (Bankr. N.D. Cal. 2003). Further, the New York Court of Appeals has emphasized that this approach has particular importance "in the context of real property transactions, where commercial certainty is a paramount concern, and where ... the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." Matter of Wallace v. 600 Partners Co., 86 N.Y. 2d 543, 548 (1995)[internal quotation marks and citations

omitted].

Whether contract language is clear or ambiguous is a question of law for resolution by the courts. Lucente v. International Bus. Mach. Corp., 310 F. 3d 243, 257 (2d Cir. 2002); W.W.W. Associates, 77 N.Y. 2d at 162. Language of a contract is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Breed v. Insurance Co. of North America, 46 N.Y. 2d 351, 355 (1978). Finally, ambiguity does not arise merely because the parties advocate different interpretations of the contract. Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y. 2d 456, 460 (1957).

Reading the Malease Stipulation as a whole, and giving each provision due weight so that all of the contractual provisions have meaning, the Court finds that paragraph 6 of the Malease Stipulation governs the application of the Kmart Funds. Lynx Associates' suggested reading of paragraph 6, i.e., that it only applies if the Debtor abandons the North Bergen Property and that there is a balance due on the Mortgage Loan, is simply not supported by the express language. In pertinent part, paragraph 6 provides that "[a]ll recoveries from the Kmart claims, ... including with respect to any Property which has been abandoned by [Lynx Associates], shall be distributed in accordance with the order for the priority of payments specified in the existing Transaction Documents, and mortgage/security documents ... provided, however, if any surplus proceeds exist after the mortgage debt relating to a specific Property is satisfied, then to pay the mortgage debt on the other Properties on a ratable basis." The use of the phrase "all recoveries from the Kmart Claims" is expansive, and easily captures the Kmart Funds produced by settlement of the Kmart Claims. Similarly, use of the term "including" to make recoveries from the Kmart Claims applicable

to abandoned Properties is inclusive rather than limiting. Most importantly, this reading of paragraph 6 gives most purpose to the paragraph. There would be little purpose for the paragraph if it did not capture settlement proceeds from the proof of claim filed by Malease in the Kmart case.

Finally, the Court also finds that the language of paragraph 6 is sufficient to cover the prospect that a sale of one or more of the Properties might occur prior to the application of any recovery on the Kmart Claims. The fact that paragraph 6 does not specifically include terms addressing the effect of a sale of Property is immaterial. The clear import of the paragraph is that the portion of any recovery from the Kmart Claims that is allocable to a particular Property, should be first applied to satisfy the obligations of that Property, and then any surplus funds may be applied to the mortgage debt of the other Properties. Any sale of a Property prior to receipt of any funds from the Kmart Claims simply increases the prospect that surplus funds will be available.

The contention by Lynx Associates that the phrase "[a]ll rental income and other like sums received from occupants of the Properties," brings the Kmart Funds within the ambit of paragraph 5 requires the Court to read the term "occupant" as including the former occupant, Kmart, and requires that the Court ignore the specific treatment accorded recoveries from the Kmart Claims that is provided in paragraph 6. This construction is at odds with the natural reading of the language in both paragraphs, and makes no sense. The Court is mindful that as in <u>Matter of Wallace</u>, 86 N.Y. 2d at 548, the Malease Stipulation in the instant matter was negotiated by sophisticated, counseled business people. To read the Malease Stipulation as urged by Lynx Associates requires the Court to imply terms that are not stated and to treat paragraph 6 as largely irrelevant. This approach is not appropriate. It has been said by the Court of Appeals that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties

under the guise of interpreting the writing." Reiss v. Financial Performance Corp., 97 N.Y. 2d 195, 199 (2001). Accordingly, the Court declines to adopt the construction urged by Lynx Associates.

## II.     Malease Stipulation as an Executory Contract

Lynx Associates stands on no firmer ground with regard to its argument that under 11 U.S.C. § 365 the Malease Stipulation is an executory contract, which may be rejected by Lynx Associates in the exercise of its business judgment.

The Third Circuit has adopted the Countryman test for determining the existence of an executory contract. See, In re Columbia Gas Systems, Inc., 50 F.3d 233, 239-40 (3d Cir. 1995); Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989). An executory contract is "a contract under which the obligations of both the bankrupt and the other party to the contract are so unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Columbia Gas, 50 F.3d at 239. The time for determining whether a contract is executory is the date on which the bankruptcy case is filed. Id. at 240. To determine whether failure to perform the remaining obligations constitutes a material breach, the court must look to contract principles under relevant nonbankruptcy law. Id. at 239, fn. 10.

Under New York law, a material breach goes to the root of the agreement between the parties and defeats the parties' object in the making of the contract. Frank Felix Associates, Ltd. v. Austin Drugs, Inc., 111 F 3d 284, 289 (2d Cir. 1997). A material breach is "one which would justify the other party to suspend his own performance, or a breach which is so so substantial as to defeat the purpose of the entire transaction." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 895 (2d

13

Cir. 1976).

In the Court's judgment, at the time that Lynx Associates filed its Chapter 11 petition, the only party with unperformed material obligations was Lynx Associates. At or about the time that the Malease Stipulation was executed and approved by the Court, Malease paid Lynx Associates $287,481.00, conveyed its capital stock to Lynx Associates, and cooperated to terminate its taxable year. Kadish, as a third party beneficiary of the Malease Stipulation, was likewise obligated to cooperate in the termination of Malease's taxable year, had the obligation to not unreasonably withhold his consent to any compromise or settlement of the Kmart Claims, and could elect to require that any Property abandoned by Lynx Associates be conveyed to him.

Thus, when Lynx Associates filed its petition, Malease had no further obligations and Kadish's remaining obligations cannot be understood as material. That is, with regard to the Kmart Claims, he was only obligated to not unreasonably withhold consent to a compromise of the claims. He was not obligated to participate either in the prosecution of those claims or in negotiations to settle those claims. He had no obligation to fund any effort to collect on the Kmart claims. With regard to abandonment of any Property, Kadish merely had the option to require that an abandoned Property be conveyed to him - not the obligation to take such a Property. As a result, this provision in paragraph 3 cannot reasonably be construed as imposing a material obligation on Kadish.

Lynx Associates' argument that paragraph 3(b) imposes an obligation on either Malease or Kadish is equally unavailing. In pertinent part that provision provides that "[u]pon and following the Effective Date, ... (b) [Lynx Associates] and Assignee will observe and perform (or cause to be observed and performed) the covenants and agreements of paragraph 5 of the Three Party Agreement." This provision merely requires performance by Lynx Associates or its Assignee. It

14

requires no performance by Malease or Kadish. Whatever performance obligations exist for Kadish arises from the Three Party Agreement, not the Malease Stipulation. By contrast, under the Malease Stipulation, Lynx Associates had continuing obligations not only with regard to the Three Party Agreement, but also with regard to the Kmart Claims. However, because material obligations existed only for Lynx Associates, the Malease Stipulation is not an executory contract.

## CONCLUSION

For the reasons set forth above, the Remainderman's motion for summary judgment is granted, and Lynx Associates' cross-motion for summary judgment is denied.